IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PATCH PRODUCTS, INC.,

                                    Plaintiff,

     v.

L.B. GAMES, INC. d/b/a FIND IT GAMES,
ROBERT KNIGHT and LYNN KNIGHT,

                                  Defendants.

OPINION AND ORDER

09-cv-40-slc[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Patch Products, Inc. brought this action against defendants L.B. Games, Inc., Robert Knight and Lynn Knight, seeking a declaratory judgment that it has not breached its contractual obligations to defendants and will not infringe defendants' proprietary rights by producing, marketing and distributing its tumbler games. Defendants have moved to dismiss the complaint on two grounds: 1) lack of subject matter jurisdiction

---

[1] While this court has a judicial vacancy, it is assigning 50% of its caseload automatically to Magistrate Judge Stephen Crocker. It is this court's expectation that the parties in a case assigned to the magistrate judge will give deliberate thought to providing consent for the magistrate judge to preside over all aspects of their case, so as to insure that all cases filed in the district receive the attention they deserve in a timely manner. At this early date, consents to the magistrate judge's jurisdiction have not yet been filed by all the parties to this action. Therefore, for the purpose of issuing this order only, I am assuming jurisdiction over the case.

under Fed. R. Civ. P. 12(b)(1) because no case and controversy existed when plaintiff commenced the action and 2) lack of personal jurisdiction over the Knight defendants under Rule 12(b)(2) given their insufficient contacts with the Western District of Wisconsin. Dkt. #10. In the alternative, defendants ask that the court transfer venue to the United States District Court for the Western District of Washington pursuant to 28 U.S.C. § 1404(a). In response, plaintiff argues that a real and substantial controversy exists because defendants have affirmatively asserted their contractual and proprietary rights against plaintiff; this court has personal jurisdiction over the Knight defendants because they conduct regular and significant business in Wisconsin; and defendants have provided no factual or legal basis for transferring the case to the Western District of Washington.

I find that at the time that plaintiff filed its complaint, an actual controversy had not arisen between the parties within the meaning of the Declaratory Judgment Act. Although plaintiff's game might pose a future risk to certain proprietary rights of defendants, the alleged dispute is not definite or concrete. Because plaintiff has failed to show that it faced a real and immediate threat or engaged in any activity that could subject it to a claim, defendants' motion to dismiss for lack of subject matter jurisdiction will be granted. Because this ruling disposes of the case, it is unnecessary to address defendants' arguments regarding personal jurisdiction and transfer of venue.

From the complaint and the documents the parties submitted in conjunction with the pending motion, I find the following facts to be undisputed.

JURISDICTIONAL FACTS

A. The Parties and the Product-in-Issue

Plaintiff Patch Products, Inc. is a Wisconsin corporation with its principal offices in Beloit, Wisconsin. It is a small, family-owned business specializing in the development, marketing and production of various family games and puzzles. Defendants Robert and Lynn Knight are husband and wife. At all times relevant to this action, the Knights have resided in Redmond, Washington. Robert Knight is the president of defendant L.B. Games (doing business as Find It Games), which is a Washington corporation with its principal place of business in Monroe, Washington. Lynn Knight is a principal shareholder in the corporation. L.B. Games is a small, family-owned business that has manufactured, distributed and sold Find It brand amusement games since 2003.

The Find It game is a transparent cylinder filled with small, multicolored bits of granular plastic. Hidden within the bits of granular plastic are a number of small objects. The player manipulates the cylinder by turning, spinning, twisting or shaking it in order to bring the small objects to the surface of the granular material where the objects can be identified by viewing them through the cylinder wall. Robert Knight owns United States

3

Trademark Registration No. 2,872,765 for the mark "FIND IT" for use in connection with "manipulative games." Since 2002, defendants have owned rights in a pending United States patent application claiming the invention of the game.

### B. Pre-Litigation Events

In spring 2008, Jim Green, vice president and general counsel for plaintiff, contacted Robert Knight about either acquiring L.B. Games or entering into a joint venture. Green invited the Knights to travel at plaintiff's expense to its offices. The parties met in Beloit, Wisconsin in early June 2008. On June 3, 2008, the parties executed a "Mutual Confidentiality and Non-Disclosure Agreement," in which the parties recognized that each "owns and possesses certain confidential and proprietary information with respect to its business" and agreed to not disclose such information to third parties and use it only to further their proposed or existing business relationship. The agreement also provided that it would be governed by Wisconsin law.

After returning home, the Knights received a proposed asset purchase agreement from plaintiff, which they found unacceptable. Robert Knight sent a letter to Green on July 15, 2008, declining the offer. During these negotiations, the parties discussed whether defendants owned any intellectual property rights in the Find It game. According to Green, the existence of such rights was critical to plaintiff's decision to purchase the game. Because

4

the Find It game and its packaging is marked "patent pending 2002," Green asked the Knights whether there was a pending patent registration or application. Robert Knight told Green that they had filed a patent application and that it remained pending. Knight did not reveal the details of the patent claims. (The parties disagree about whether the Knights made evasive or contradictory statements about the pending patent or other proprietary rights in the game). In an email and letter to Robert Knight in July 2008, Green indicated that "negotiations had ceased" because the parties were unable to reach an agreement. The Knights have not had further contact with plaintiff regarding an acquisition or asset sale since that time.

Believing that the desirable elements of the Find It game were in the public domain, plaintiff began development of its own product on August 5, 2008. Throughout the fall of 2008, plaintiff created drawings, toolings and marketing materials for its own game, which it hoped to launch at the February 2009 International Toy Association Fair. Between October 6-14, 2008, plaintiff finished a temporary tooling and created the first component parts for its game's prototype. Plaintiff presented the prototype to one of its retail customers on October 29, 2008. Plaintiff completed a permanent tooling for its game by December 2008. During this time, plaintiff was not aware of any intellectual property or proprietary rights, other than the FIND IT trademark, that defendants owned in the game. However, because it thought that defendants were evasive during their negotiations regarding the

5

existence of a patent application and other intellectual property, "plaintiff became concerned that defendants were asserting a patent or protectible interest of which it was unaware in the Find It Game."

In mid-December 2008, a contract sales representative for L.B. Games received an email from Neil Kohler of the Wilko Group, saying, "Right now, Patch is quoting an item called 'Ahh Ha!' that is a Find It knock off." Because the Knights were concerned about the product being described as a "knock off" of the Find It game, they contacted their attorney, Jerald Nagae. In a letter to Green dated December 30, 2008, Nagae notified plaintiff of defendants' concerns that plaintiff's "proposed products may include, or may be based on, proprietary information and/or technology of our clients:"

> Find It! Games expects that Patch Products, Inc., will immediately cease any and all product development, product manufacture, or any other activity that is contrary to the mutual confidentiality and non-disclosure agreement, as well as acknowledgment by Patch Products, Inc., of the proprietary nature of the products of Find It! Games. . . . Find It! Games considers the violation of its proprietary rights to its products to be a very serious matter, and will take all necessary steps to enforce such proprietary rights. . . . we would expect that Patch Products, Inc., would want to be very conservative with respect to any potential encroachment on the rights of our client.

On January 8, 2009, Green sent Nagae an email to confirm a recent conversation concerning Nagae's December 30 letter. In that email, Green noted that Nagae was going to ask the Knights what "acknowledgment" was made by plaintiff and what proprietary rights and trade secret information were at issue. (The parties dispute whether Nagae

6

informed Green that defendants had not yet evaluated plaintiff's game and whether Nagae stated that "he typically sends these types of letters when one party is in breach of an agreement.") Nagae contacted the Knights to obtain further information and determine how to respond to Green. However, the first date on which Nagae could meet with the Knights was January 28, 2009, after plaintiff filed the declaratory action in this case.

### C. Post-Litigation Events

Plaintiff filed its complaint in this court on January 21, 2009. It made the following allegations:

- In early June 2008, "[t]he parties discussed the possibility of a joint venture, a licensing arrangement, acquisition of any assets associated with the Game by Patch, or acquisition of Find It Games by Patch."

- "Negotiations between the parties regarding a possible business venture continued during June and July of 2008."

- "Despite the Defendants marking the Game with 'patent pending 2002,' during their negotiations, the Defendants informed Patch that while they hoped to obtain patent protection, they had not yet done so. The Defendants never identified any definitive intellectual property rights or proprietary rights they owned in the Game."

- "During the last year, Patch has taken meaningful steps in developing and manufacturing several new tumbler games which are fully ready to be introduced to the public for distribution and sale at the Toy Industry Association's annual Toy Fair held in New York City on February 15-18, 2009. (Photographs of Patch's tumbler games are attached as Exhibit 6). The above-referenced Toy Fair is one of the

7

> most significant marketing events in the toy industry, and is customarily the time and place wherein toy companies introduce their new products for the year. In addition, Patch has entered into third party license agreements in connection with the development and marketing of its tumbler games."

Cpt., dkt. #1, at ¶¶ 16-22 and 28-29.

On January 29, 2009, defendant L.B. Games filed an application for a United States Trademark for the design of the game (Application Serial No. 77,659,666). At the time the complaint was filed, no one at L.B. Games had seen any drawings or photographs of plaintiff's game. The Knights have never seen the actual Ahh Ha! game, either in mock-up or production form.

On February 3, 2009, defendants sent a letter to all of its customers, many of whom are also plaintiff's current or potential customers, to make them aware that plaintiff was launching a product line that is "nearly identical" to the Find It game and that plaintiff's game was not licensed or authorized by defendants. Defendants' intent behind the letter was to explain the lawsuit to its customers. Plaintiff first learned that defendant L.B. Games was pursuing federal trademark and patent applications on April 22, 2009, when it received defendants' responses to plaintiff's first set of interrogatories.

OPINION

Fearing future claims for proprietary right infringement and breach of contract, plaintiff brought this suit under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), which provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Plaintiff has the burden of establishing that subject matter jurisdiction existed at the time that it filed its claim for declaratory relief. Benitec Australia, Ltd. v. Nucleonics, Inc., 495 F.3d 1340, 1344 (Fed. Cir. 2007). Although there is no bright-line test for determining whether a declaratory judgment action satisfies the case-in-controversy requirement, the Supreme Court has held that there must be "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007) (quoting Maryland Casualty Company v. Pacific Coal & Oil Company, 312 U.S. 270, 273 (1941)).

Since MedImmune, the Court of Appeals for the Federal Circuit has expounded on the criteria established by the Supreme Court:

> In the context of conduct prior to the existence of a license, declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee. But Article III jurisdiction may be met where the patentee takes a

9

> position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do.  We need not define the outer boundaries of declaratory judgment jurisdiction, which will depend on the application of the principles of declaratory judgment jurisdiction to the facts and circumstances of each case.  We hold only that where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights.

SanDisk Corporation v. STMicroelectronics, Inc., 480 F.3d 1372, 1380-81 (Fed. Cir. 2007); see also Tuthill Corporation v. ArvinMeritor, Inc., 2008 WL 4200888, *3 (N.D. Ill. Sept. 5, 2008) (quoting same).  The Federal Circuit noted that its holding was consistent with decisions in various cases unrelated to patent licensing.  SanDisk, 480 F.3d at 1381 (citations omitted); see also Wisconsin Central, Ltd. v. Shannon, 539 F.3d 751, 760 (7th Cir. 2008) (citing MedImmune standard in declaratory and injunctive action regarding preemption of overtime claims); Surefoot LC v. Sure Foot Corporation, 531 F.3d 1236, 1243 (10th Cir. 2008) (finding that nothing in MedImmune's analysis limits its interpretation of Declaratory Judgment Act to patent cases).

The Court of Appeals for the Seventh Circuit has discussed the MedImmune standard in more detail.  In ascertaining whether a lawsuit is of "sufficient immediacy and reality" to warrant review, the court of appeals looked to the Supreme Court's decision in Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967), in which the Court stated that "ripeness

10

determinations depend on 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" Wisconsin Central, Ltd. v. Shannon, 539 F.3d 751, 760 (7th Cir. 2008) (declaratory and injunctive action regarding preemption of overtime claims); Metropolitan Milwaukee Association of Commerce v. Milwaukee County, 325 F.3d 879, 882 (7th Cir. 2003) (county ordinance preemption issue) (quoting same). In Wisconsin Central, the court of appeals recognized that although cases involving predominantly legal questions are often ripe for review, questions requiring a case-by-case factual analysis may not yet have a sufficiently developed record. Wisconsin Central, 539 F.3d at 760. With respect to the second factor, hardship, the court of appeals has looked to whether enforcement is certain and only delayed, or "even if it is not certain, the mere threat of future enforcement has irremediably adverse consequences." Metropolitan Milwaukee Association, 325 F.3d at 882 (citations omitted).

According to plaintiff, "defendants have engaged in a coercive course of conduct . . ., creating a very real controversy that is ripe for determination." In support of its argument, plaintiff points to Nagae's letter and defendants' vague, elusive and non-responsive behavior with respect to plaintiff's alleged wrongdoing. (Although plaintiff cites the facts that defendants have been actively informing the public that plaintiff is making a "knock off" game and attempting to obtain federal protection for their product, both of these events occurred after plaintiff filed suit and are irrelevant to whether a justiciable case or

11

controversy existed when plaintiff filed this lawsuit).  Defendants counter that the current suit is neither definite or concrete because they had only hearsay information about plaintiff's product and could not have filed an infringement or breach of contract action even if they had wanted to.

In his letter, Nagae stated that plaintiff "may be" violating defendants' rights, asked plaintiff to cease all activity that is contrary to the mutual confidentiality and non-disclosure agreement, asked plaintiff to "acknowledge" the "proprietary nature" of the Find It! game and stated that defendants will take all necessary steps to enforce their proprietary rights. Given the context in which these statements were made, I do not find that they constitute the type of affirmative act required to establish Article III jurisdiction.

Plaintiff argues unpersuasively that it faced a dilemma like that of the plaintiffs in MedImmune, SanDisk and Tuthill, in which the courts allowed a declaratory action.  In MedImmune, 549 U.S. at 128, the defendant claimed a right to royalties under a licensing agreement and threatened to sue plaintiff if it did not pay the royalties.  The Supreme Court found that the factual and legal dimensions of the lawsuit were well-defined but noted that because plaintiff was making royalty payments, there was no "imminent threat" that defendant would bring an infringement claim.  Id.  After reviewing several of its past decisions, the Court concluded that defendant's not doing what it claimed the right to do did not preclude subject matter jurisdiction because the threat-eliminating behavior was

12

effectively coerced. Id. at 129-34 (citations omitted). "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" Id. at 129 (analogizing patent licensor's threat to sue to government's threat to enforce statute) (quoting Abbott Laboratories, 387 U.S. at 152). Similarly, in SanDisk, 480 F.3d at 1382, the defendant sought royalty payments from plaintiff under its patents and had litigation experts present plaintiff with a thorough infringement analysis during licensing negotiations, identifying element-by-element the manner in which it believed that plaintiff's products infringed its patents. In Tuthill, 2008 WL 4200888, *5, the defendant sent a letter identifying plaintiff's product and the patents allegedly violated, stating that manufacturing, using or offering the product for sale would constitute infringement. Defendant added that it was prepared to take legal action. After plaintiff denied possible infringement and asserted that defendants' patents were invalid, negotiations between the parties ensued.

Defendants in this case have not taken a position that forces plaintiff either to pursue arguably illegal behavior or abandon its product. Defendants' communications with plaintiff were not specific, did not identify the objectionable product or the proprietary rights involved or the way in which plaintiff's future product would violate those rights. Applera Corporation v. Michigan Diagnostics, LLC, 594 F. Supp. 2d 150, 160 (D. Mass. 2009)

13

(finding similar lack of specificity in parties' communications); cf., Sony Electronics, Inc. v. Guardian Media Technologies, Ltd., 497 F.3d 1271, 1285 (Fed. Cir. 2007) (finding case fit for resolution where defendant identified patents, relevant claims in patents and allegedly infringing products and plaintiff identified its reasons for believing patents to be invalid). Nagae's warning letter was based on rumors of an "identical" product and essentially asked plaintiff to proceed with caution. The parties had not entered into any negotiations regarding infringement or breach of contract. Although Nagae made it clear that defendants would be willing to enforce their rights, there is no indication that they were prepared to do so or that they even believed that a violation had occurred. Cf., SanDisk, 480 F.3d at 1383 (finding defendant's conduct "shows a preparedness and willingness to enforce its [proprietary] rights").

As the Federal Circuit pointed out in Benitec, 495 F.3d at 1344, "[a] useful question to ask in determining whether an actual case and controversy exists is what, if any, cause of action the declaratory judgment defendant may have against the declaratory judgment plaintiff." At the time plaintiff filed its complaint, defendants had only begun the process of inquiring into plaintiff's product and exploring potential infringement or breach of contract. The only information defendants had about plaintiff's product was that a third party described it as "identical." Plaintiff has pointed to no evidence indicating that the Knights or their representatives ever saw the product or discussed its design with plaintiff.

14

Apart from cursory references to trademarks and a pending patent, defendants' proprietary rights are not defined in specific terms. Even plaintiff alleges in its complaint that defendants never identified any definitive intellectual property or proprietary rights that they owned in the game. Accordingly, it is highly unlikely that defendants had any claims that they could bring in good faith against plaintiff. E.g., In re Seagate Technology, LLC, 497 F.3d 1360, 1373 (Fed. Cir. 2007) ("when a complaint is filed, a patentee must have a good faith basis for alleging willful infringement").

Plaintiff argues, unpersuasively again, that defendants have remained vague purposefully in order to avoid a declaratory action. The record shows that Robert Knight and Nagae spoke in vague terms to plaintiff because they had no idea what product plaintiff was proposing or whether it would even violate their proprietary rights. In early January 2009, Nagae told Green that he would speak with his clients to better understand their objections and what proprietary rights were of concern. However, plaintiff filed suit before Nagae could meet with his clients. Had plaintiff waited more than 14 days for a response from Nagae, it may have been able to answer its questions regarding defendants' position.

In sum, plaintiff has not provided sufficient information from which this court can assess whether plaintiff's game would violate defendants' proprietary rights. Aetna Life Insurance Company of Hartford, CT v. Haworth, 300 U.S. 227, 241 (1937) (court cannot advise parties on "what the law would be upon a hypothetical state of facts"); Benitec, 495

15

F.3d at 1349. As a result, plaintiff has not met its burden of showing that it faced a real and immediate threat or even that it engaged in any activity that could subject it to a claim. Prasco, LLC v. Medicis Pharmaceutical Corporation, 537 F.3d 1329, 1338 (Fed. Cir. 2008) (standard for actual controversy "cannot be met by a purely subjective or speculative fear of future harm").

As a final matter, I note that both parties also discuss the discretion that federal district courts have with respect to declaratory judgment actions. Because the Declaratory Judgment Act states that courts "may" grant relief, § 2201(a), the Supreme Court has held that the Act gives district courts "unique and substantial discretion in deciding whether to declare the rights of litigants." Sony, 497 F.3d at 1287-88 (quoting Wilton v. Seven Falls Company, 515 U.S. 277, 286 (1995)). This is true, but the law requires an actual, substantial controversy between the parties of sufficient immediacy and reality to warrant a declaratory judgment. Nucor Corporation v. Aceros Y Maquillas de Occidente, S.A. de C.V., 28 F.3d 572, 577 (7th Cir. 1994). Additionally, a declaratory judgment is appropriate only if "1) [t]he controversy has ripened to a point where one of the parties could invoke a coercive remedy (i.e. a suit for damages or an injunction) but has not done so; and (2) [a]lthough the controversy is real and immediate, it has not ripened to such a point, and it would be unfair or inefficient to require the parties to wait for a decision." G. Heileman Brewing Company, Inc. v. Anheuser-Busch, Inc., 873 F.2d 985, 989-90 (7th Cir. 1989)

16

(quoting <u>Tempco Electric Heater Corporation v. Omega Engineering, Inc.</u>, 819 F.2d 746, 749 (7th Cir. 1987)).  As previously discussed, there is no indication from the facts of record that defendants could bring suit at this time or that it would be unfair and inefficient to have the parties wait for the controversy to ripen.  A declaratory judgment under these circumstances would not afford plaintiff the relief it seeks from the uncertainty, insecurity and potential controversy giving rise to this lawsuit.  Therefore, I decline to exercise discretionary jurisdiction over this case.

ORDER

IT IS ORDERED that the motion of defendants Robert and Lynn Knight and L.B. Games to dismiss the complaint for lack of subject matter jurisdiction, dkt. #10, is GRANTED.  Defendants' motion to dismiss Robert and Lynn Knight for lack of personal jurisdiction and request for a transfer of venue are DENIED as unnecessary.

Entered this 6th day of May, 2009.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge